OPINION OF THE COURT
Jay Stuart Dankberg, J.
How summary should a summary proceeding be? Too summary to permit an impleader?
In this nonpayment summary proceeding, respondent tenant, acting pro se, moves by order to show cause to implead the New York City Department of Environmental Protection (EPD). Petitioner landlord, by letter dated July 17, 1980, responds by stating that it “welcomes * * * inspection of the apartment” by “representatives of the Environmental Protection” Department.
The EPD Office of General Counsel, served with the order to show cause, defaulted on the return date. After being contacted concerning their default, an EPD attorney appeared the next day. Although no papers were *471 submitted either to vacate their default or oppose or consent to the application, he did orally argue that the court had no jurisdiction to thus implead the EPD. A brief decision was then placed on the record and it was stated that a more detailed decision would be forthcoming. This is such written decision.
The court’s research into the question of impleading third parties into summary proceedings has uncovered decisions involving the New York City Department of Social Services (allowed — see, e.g., Merlin Realty Corp. v Santiago, NYLJ, Oct. 3, 1979, p 14, col 1 [Miller, J.], and Phipps Plaza South Housing Dev. Fund Corp. v Torres, NYLJ, Sept. 26, 1974, p 17, col 7 [Levy, J.]; not allowed — see, e.g., Matter of Estate of Weiss v Downing, NYLJ, Feb. 13, 1975, p 18, col 7 [App Term], and Allison v Medina, NYLJ, July 11, 1974, p 11, col 2 [Shorter, J.]); the United States Veterans Administration (not allowed — Marcy Realty Co. v Glassy, 79 Misc 2d 925 [Nolan, J.]); the New York State Public Service Commission and Consolidated Edison (allowed — Bryant Hoe Corp. v Valentine, 83 Misc 2d 5, 7 [Peck, J.]); a private insurance carrier, after a fire (allowed — Welsh v Lublin, NYLJ, March 28, 1975, p 13, col 8 [Milano, J.]); the Comptroller of the City of New York, President of the City Council and unnamed elected officials, government agencies and community groups (not allowed — 233 233 Co. v City of New York, NYLJ, Sept. 28, 1979, p 5, col 1 [App Term]); a community board established under the city charter (allowed — Housing & Dev. Admin, of City of N. Y. v Ruel Realty Co., NYLJ, Jan. 31, 1979, p 10, col 6 [Cohen, J.]); and even a cotenant of the originally named tenants (72nd Tenants Corp. v Rosen, NYLJ, Dec. 26, 1973, p 16, col 2 [Marks, J.]).
However, no reported case has been found involving the attempted impleader of the New York City Department of Environmental Protection. Accordingly, this is a case of apparent first impression.
*472 BACKGROUND TO THE LITIGATION
Both residents and tourists have in recent years adopted what originally was a musicians’ description of New York City as “the Big Apple”. Television and radio commercials inform us that there are streets and avenues in New York on which the ethnic and cultural diversity of the world appear. So, too, are there streets and avenues on which appear both the heights and depths of the economic and social life of our city, State, Nation and world.
One of these streets, perhaps at the core of the Big Apple, is 42nd Street; song, motion picture and musical play have been dedicated to it. The street traverses midtown Manhattan; as one travels from east side to west side, the difference in economic standards is literally astonishing. On the east, arisen from the depths of what were teeming tenements and smell-sickening slaughterhouses are the world headquarters of the United Nations and the massive residential development called Tudor City. Going west, one passes the beautiful, park-like atmosphere of the Ford Foundation Building, the information centers of the Daily News Building and the New York Public Library, the modernity of the Grand Hyatt Hotel and the vastness of Grand Central Terminal and the Chrysler Building — once the tallest in the world (AIA Guide to New York City [1st ed], p 121). However, starting with what was once a potter’s field, now known as Bryant Park, the tawdry, “honkey-tonk” part of New York, the Times Square area, begins. If the east side represents the zenith of New York, Times Square, with its flotsam and jetsam prostitutes, pimps, pornographers and other purveyors of poison, represents the nadir of our society. It is an area that has resisted one cleanup after another.
As we enter the decade of the 80’s, yet another effort at reforming this historical neighborhood is in full swing. In the area around Ninth and Tenth Avenues, with much fanfare and large infusions of government and private funds, the community is having a renaissance. New theaters have been erected, new restaurants opened *473 and a large new multistory residential building constructed. The building, known as Manhattan Plaza (petitioner herein), houses many people employed in the arts, with rents being subsidized by various programs. The petitioner, with justifiable pride, calls itself “the miracle on 42nd Street”.
However, on January 24, 1980, the “miracle” burst for the tenant in Apartment 39S (the subject of this lawsuit) — a fire occurred, which severely damaged the dwelling unit. By April 25, a check for $24,562 in settlement of the fire damage was received by the City of New York (as mortgagee), the Department of Housing Preservation and Development, and/or the petitioner landlord.
On or before that date, according to landlord, most (if not all) of the repairs necessary to restore the apartment to habitable condition had been completed. However, tenant contends that such is not accurate. She alleges that on April 25 there were still present air vents full of fire residue and a “musty odor” from the fire, caused by improper repairs.
After informal discussions were not successful in amicably resolving this situation, landlord started the present nonpayment proceeding, seeking partial payment of April, 1980 rent and complete rent from May 1 forward.
In her answer, inter alla, tenant complained of a “musty odor” throughout the apartment and of improper repair of the fire damage. In requesting a New York City Buildings Department inspection, she stated that “black greasy polyurethane combustion residue from mattress fire was not removed from walls or ceilings after fire. Walls and ceilings were merely covered over with paint causing residual odors to linger in apt making occupants sick”.
A buildings department inspector visited on June 19, 1980, and reported that he “found smoky odor in apartment”.
Thereafter, landlord agreed to do or redo some seven additional items, at least one of which it had previously repaired. However, tenant, fearful that the fire may have *474 resulted in a condition called “outgassing”, which might have toxic effects, has moved pro se for an order impleading the EPD so that EPD, the city’s “clean air” experts, might be directed to do analysis within the apartment and either lay to rest tenant’s fears or instruct landlord how to make the apartment once again habitable. If the EPD were to determine the condition exists and landlord then fails to make such repairs, the court, pursuant to its powers under subdivision [c] of section 110 of the New York City Civil Court Act, could compel the EPD as a party respondent to do the same and obtain a lien against any rent otherwise owed petitioner landlord.
THIRD-PARTY IMPLEADER
Before enactment of the Housing Court Act (L 1972, ch 982, creating CCA, § 110), the general rule has been that third-party practice was held not applicable to summary proceedings. Attempted impleader was routinely rejected, with most such cases citing Edaviel Corp. v Boykin (205 Misc 622) (see, also, unreported cases cited in Rothbaum v Ebel, 77 Misc 2d 965, at p 967 [Nusbaum, J.]; cf. Sessa v Blakney, 71 Misc 2d 432, and Blackman v Walker, 65 Misc 2d 138).
In Edaviel Corp., the Appellate Term held (p 622) that “[t]here is no provision in the summary statute for third-party practice.” That statute was section 1425 of the Civil Practice Act, which provided that “the court, upon rendering a final order, may determine the amount of rent due to the petitioner and give judgment for the amount found to be due.”
Normally, in 1980, civil practice in summary proceedings is governed by various sections of the CPLR, RPAPL, CCA, and Rules of the Civil Court of the City of New York (22 NYCRR 2900). Edaviel Corp. v Boykin (supra) was decided before the enactment of the CPLR and RPAPL and before the creation of the Civil Court and the Housing Part thereof.
CPLR 401 provides, in pertinent part, that “after a [special] proceeding is commenced, no party shall be joined or interpleaded and no third-party practice or in *475 tervention shall be allowed, except by leave of court.” This gives the court discretionary authority to allow impleader in a summary proceeding. Incredibly, and in apparent contradiction of this plain language, especially when read together with RPAPL article 7 denominating a summary proceeding a special proceeding in sections 701, 711, 713, 731 and 761 (see 2 Rasch, New York Landlord and Tenant, Summary Proceedings [2d ed], § 994), the Appellate Term, Second Department, in 1975 held “that CPLR 401 was not intended to govern in a summary proceeding” (Zytelny v Lodge, NYU, Feb. 5, 1975, p 17, col 1; cf. 3 Rasch, New York Landlord and Tenant, Summary Proceedings [2d ed], § 1297).
However, RPAPL 747 (subd 1) broadens the power of the court from the days of the Civil Practice Act and Edaviel Corp. v Boykin (supra) (Sessa v Blakney, supra, at p 434) and provides that “the court shall direct that a final judgment be entered determining the rights of the parties.”
Moreover, since October 1, 1973 (the effective date of the Housing Court Act), a revolution has taken place in this area of civil procedure.
In creating the Housing Court, the Legislature set forth a statement of policy, contained in section 1 of chapter 982 of the Laws of 1972, as follows:
“(a) The legislature finds that the effective enforcement of state and local laws for the establishment and maintenance of proper housing standards is essential to the health, safety, welfare and reasonable comfort of the citizens of the state. The legislature further finds that * * * no single court has been able to deal consistently with all of the factual and legal problems presented by the continuing existence of housing violations in any one building. * * * The legislature further finds that the establishment of adequate judicial procedures and machinery [to] the effective enforcement of building standards in the city of New York is a necessity in the public interest.
“(b) The legislature finds that the effective enforcement of proper housing standards in the city of New *476 York will be greatly advanced by the creation of a housing part of the civil court of the city of New York with jurisdiction of sufficient scope (i) to consolidate all actions related to effective building maintenance and operation, (ii) to recommend or employ any and all [other] remedies, programs, procedures and sanctions authorized by federal, state or local laws <or the enforcement of housing standards, regardless of the relief originally sought by the plaintiff, if it believes that such other or additional remedies, programs, procedures or sanctions will be more effective to accomplish and protect and promote the public interest and compliance”.
In fact, the Housing Court Act itself (CCA, § 110), provides in pertinent part: “(d) In any of the actions or proceedings specified in subdivision (a) and on the application of any party, any city department or the court, on its own motion, may join any other person or city department as a party in order to effectuate proper housing maintenance standards and to promote the public interest.”
This section authorizes joinder “on the most, liberal of terms, enhancing the court’s potential as a source of novel and wide-ranging solutions to problems of housing maintenance. Unfortunately, this provision has been infrequently invoked and thus [is] of little benefit” (Rutzick & Huffman, The New York City Housing Court: Trial and Error in Housing Code Enforcement, 50 NYU L Rev 738, 765-766).
One of the reasons for such lack of use may be that no specific provision exists in the RPAPL for a third-party order incorporating a third-party judgment in a “final judgment” (see Gorman v Gorman, 77 Misc 2d 687, 688, and Edaviel Corp. v Boykin, supra, at p 623). However, subdivision [d] of section 110 of the CCA clearly represents legislative creation of a statutory remedy for joining additional persons or municipal departments as parties in a summary proceeding.
There are presently no “official Civil Court forms” for the court (a) to make “its own motion”, (b) “on the appli *477 cation of any party,” to declare a person or city department impleaded into a summary proceeding, or (c) to permit the pro forma entry of a final judgment in such proceeding. However, the question whether a third-party judgment may be necessary at the time of entry of a final judgment in this case is presently premature and should not affect the question whether impleader should now be permitted. Certainly, assuming “that creation of the Housing Court was a serious effort by the New York State Legislature to grapple with the housing crisis of New York City” (Weiss v Downing, NYLJ, May 20, 1974, p 20, col 5 [Welcome, J.], revd on other grounds sub nom. Matter of Estate of Weiss v Downing, NYLJ, Feb. 13, 1975, p 18, col 7 [App Term]), the better course to pursue now is to permit impleader. If and when the likelihood of a third-party judgment becomes more clearly evident, the court can then resolve that issue. In any event, third-party judgments in summary proceedings are still an open issue and one which the Legislature or appellate courts must ultimately resolve.
Also, contrary to any argument that impleader might defeat the summary nature of a summary proceeding (see Civil Court Committee on Continuing Education, Third Party Practice in Landlord Tenant Cases [1975], p 1), permitting impleader in a case similar to the one at bar can only expedite disposition of the entire controversy, avoid multiplicity of other lawsuits between the parties to accomplish the same result and, at the same time, do speedy justice for all (1 Weinstein-Korn-Miller, NY Civ Prac, par 401.06). “[A]nything which will afford even speedier justice is not opposed to the philosophy of the summary proceeding” (Metropolitan Life Ins. Co. v Carroll, 43 Misc 2d 639, 641).
In decisions involving impleader, many of the reported cases have also differed whether impleader should be limited to a direct relationship with physical maintenance, repair and rehabilitation of housing accommodations (cf. Merlin Realty Corp. v Santiago, NYLJ, Oct. 3, 1979, p 14, col 1, supra, and Lazarus v Kandler, NYLJ, *478 Aug. 7, 1974, p 12, col 5, with Allison v Medina, NYLJ, July 11, 1974, p 11, col 2, supra, and Gorman v Gorman, supra).
This court agrees with Lazarus v Kandler that in “[n]o way can the words of section 110(d) be limited to bricks and mortar.” So, too, in Merlin Realty Corp. v Santiago (supra): “subdivision (d) of section 110 of the New York City Civil Court Act *** should not be construed narrowly and limited only to cases concerning maintenance and repair of buildings.” Indeed, impleader should be liberally applied in order to enhance “the court’s potential as a source of novel and wide-ranging solutions to [the] problems of housing maintenance” (Rutzick & Huffman, The New York City Housing Court: Trial and Error in Housing Code Enforcement, 50 NYU L Rev, 738, 765).
I do not intend to usurp the functions of any appellate court to determine the extent of the Housing Court’s ultimate authority to implead any person or city department into a pending summary proceeding pursuant to subdivision [d] of section 110 of the CCA. However, under appropriate circumstances, and following the public policy enunciated by section 110 of the CCA and chapter 982 of the Laws of 1972, a Judge of the Housing Part should properly exercise broad judicial discretion and implead any relevant municipal agency to solve any housing problem (see Gold v Soto, 78 Misc 2d 390, 392, revd on other grounds sub nom. Matter of Estate of Weiss v Downing, supra).
Moreover, subdivision [c] of section 110 of the CCA provides, in pertinent part, that “[rjegardless of the relief originally sought by a party the court may recommend or employ any remedy, program, procedure or sanction authorized by law for the enforcement of housing standards, if it believes [that] they will be more effective to accomplish compliance or to protect and promote the public interest” (emphasis added).
Even though petitioner landlord originally instituted this suit for rent, the submitted papers clearly call for the impleader to insure that the health of respondent *479 tenant and her family will not be adversely affected by a possible improper cleanup of the fire damage. This certainly will accomplish compliance with the various environmental codes which affect this apartment. In view of the many residential fires that occur annually in the City of New York, the impleader of the “clean air” city department is certainly in “the public interest” and will help effectuate “proper housing maintenance standards” for the large residential building known as Manhattan Plaza. Thus, in the instant case, the use of the impleader power is warranted though no “bricks or mortar” shall be used.
Therefore, based upon all the above, pursuant to the authority of CPLR 401 and subdivision [d] of section 110 of the CCA and in accordance with the legislative intent expressed by the Housing Court Act, the facts herein mandate the granting of respondent tenant’s motion. Accordingly, the motion to implead the New York City Department of Environmental Protection as a party respondent is within the court’s jurisdiction and it is granted.
Moreover, the EPD is directed to (1) forthwith make an inspection of the fire damaged apartment; (2) perform scientific tests to determine the nature of the “smoky odor” found by the buildings department inspector and ascertain whether such odor is harmful to residents of the apartment; (3) recommend, in writing, measures which would correct anything found to be dangerous to the life, health or safety of the respondent tenant; (4) exercise whatever authority and discretion it may have in the circumstances with particular emphasis upon restoration of the apartment to habitable condition (if it is found to be presently uninhabitable due to the “smoky odor”); (5) have the inspector(s) available, as witness(es) to be called in the interest of justice by the court, if such inspector(s) are needed upon the eventual trial of this case; and (6) be otherwise subject to any future proper order of this court, including, but not limited to, the filing of a written answer, if so requested by the parties or the court.